UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FILED

MAY 25  4 27 PM '05

CLERK
U.S. DISTRICT COURT
EAST. DIST. MICH.
BAY CITY

RONALD SCHROEDER,

Plaintiff,

v.

CITY OF VASSAR and SCOTT ADKINS,

Defendants.

_____/

Case No. 04-10195-BC
Honorable David M. Lawson

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Ronald Schroeder, was fired from his job as the City of Vassar's director of

public services. He brought suit alleging that his termination was a result of complaints he made

about acts of sexual harassment by fellow city workers, and he alleges that the defendants' actions

were unlawful under the First Amendment, the Michigan Whistleblowers Protection Act, Mich.

Comp. Laws § 15.362, and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §

37.2701. The defendants have filed a motion for summary judgment contending that as a matter of

law the plaintiff's comments did not touch on a matter of public concern, and even if they did the

undisputed facts show that the plaintiff's termination was not motivated by the plaintiff's speech.

The individual defendant, city manager Scott Adkins, also contends that he is entitled to qualified

immunity. The plaintiff filed an answer and brief opposing the motion. The Court heard the parties'

arguments through counsel in open court on April 28, 2005. The Court finds that although the

plaintiff's statements were made in defense of allegations of his own alleged misconduct, they

included complaints about matters of public concern that were constitutionally protected, there is a

fact question whether those comments were part of the reason that motivated the plaintiff's

termination, and the constitutional right that the plaintiff claims were violated was not clearly established in the factual context presented by the record in this case. The Court, therefore, will deny the City of Vassar's motion for summary judgment and grant defendant Adkins' motion for summary judgment based on qualified immunity.

I.

The plaintiff, Ronald Schroeder, began employment with the defendant City of Vassar on August 19, 2002 as the superintendent of the city waste water treatment plant. He reported directly to his supervisor, defendant Scott Adkins, the Vassar City Manager. Adkins had responsibility for the city's daily administration and, according to the city charter and Adkins himself, he had sole authority to hire and terminate city employees in Schroeder's position. *See* Pl.'s Ans. to Mot. Summ. J. Ex. 7, City Charter § 3.9; Ex. 6, Scott Adkins Dep. at 10. In July 2003, Adkins promoted the plaintiff to the position of Director of Public Services in a new department that consolidated waste water treatment operations with the Department of Public Works. Schroeder continued to report directly to Adkins.

After the plaintiff was promoted, he began to spend more time at city hall where he encountered some female city workers with whom he apparently did not get along. The relationship was marred by harsh comments by the plaintiff, who was critical of certain juvenile and lascivious remarks made by the females concerning a male contractor about whom they expressed a copulatory interest. These exchanges led to complaints by and against the plaintiff for violating the city's sexual harassment policy, and eventually to the plaintiff's termination on July 15, 2004. The plaintiff alleges that he was fired for complaining about matters of public concern, specifically the conduct of coworkers that violated the city's sexual harassment policy. The defendants contend that they

-2-

terminated the plaintiff for a variety of reasons unrelated to his speech, including poor performance, violation of safety policies, and his own misconduct. There is no dispute that the speech that the plaintiff claims is protected by the First Amendment arose in the course of a personnel dispute. Matters such as this have been characterized as "mixed speech" cases that are "highly fact-specific." *See Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). Consequently, some detail concerning the dispute, the context in which the speech was uttered, and the plaintiff's performance during his tenure is appropriate.

Throughout his tenure, the plaintiff generally received positive performance evaluations. Adkins formally evaluated the plaintiff's performance on November 26, 2003, stating:

> Ron is a good leader and supervisor . . . Ron has taken a great amount of time to reorganize the department and make positive changes. . . . Ron needs to become more assertive with certain department members and work more to improve meeting deadlines and accomplishing tasks in a timely manner. These problems lie more with subordinates than with him as a department head.

Pl.'s Ans. to Mot. Summ. J. Ex. 9, Evaluation. The plaintiff received letters of recommendation from other city officials, and was recommended for a significant merit based pay raise for fiscal year 2005. The city's mayor, Evart Stewart, testified that the pay raise indicated the plaintiff was not performing poorly and that he thought the plaintiff performed adequately. *Id*. Ex. 13, Evart Stewart Dep. at 25, 28-29. Other city officials corroborated this testimony. *Id*. Ex 14, Councilperson Penny Germain Dep. at 12-15; Ex. 15, Councilperson David Deland Dep. at 16-18; Ex. 16, Councilperson Patricia Gawne Dep. at 16-18.

After the plaintiff was promoted, he observed what he considered to be harassing conduct directed toward an electrical contractor named Mark Cooper, who worked for Cooper Electric and provided electrical technician services to the city. Schroeder alleges that female city employees

-3-

made comments whenever Cooper's name was mentioned, specifically describing three incidents. Sometime in the beginning of July 2003, the plaintiff issued a request for some electrical work. He heard the Utility Billing Clerk Merri Lemcke and Deputy Clerk Sue Kern argue over who would contact Cooper, commenting on the contractor's looks, saying "how hot he was, and '[o]h, what a body.'" Defs.' Mot. Summ. J. Ex. A., Pl.'s Dep. at 25. Cooper was not present, and the plaintiff made no complaint. Within a couple of months, the city began planning underground wiring for its fairgrounds. During a gathering of city officers, attended by Adkins, the clerks again argued over who would contact Cooper. Sue Kern commented that "I'm married, but I'll tell you what, I'd still do him." *Id.* at 27. Cooper was not present at the time, and the plaintiff did not file a complaint, claiming he was discouraged by Adkins' response of "rolling his eyes." *Ibid.* Then in November 2003, the city needed the electrical socket located in front of city hall repaired to power Christmas lights. Cooper serviced the socket, which required him to dig with a shovel. Female employees of the city, namely Lemcke, Kern, and Tina Bacon, watched Cooper out the window and made sexual comments about Cooper's posterior and physique. *Id.* at 28. Again, Cooper was not present when the employees made the comments. Schroeder also claims that Kern kept newspaper clippings of Cooper in her desk and that Lemcke told the plaintiff that "if anything happens to [Kern] I am to destroy [the clippings] in case her husband has to come and clean out her desk." *Id.* at 29. Furthermore, he describes an unrelated incident when Adkins and Lemcke each showed him a sexually explicit, offensive video on a computer monitor. *Id.* at 30-31. Although the plaintiff later filed a written complaint formally alerting Adkins to the problems, he testified that he discussed the problem in terms of "other employee's attitudes" with Adkins on several occasions. *Id.* at 33, 34.

-4-

Vassar has a written sexual harassment policy that defines prohibited conduct, prohibits sexual harassment, prescribes a three-step progressive discipline procedure ending in termination, directs affected employees to report complaints to the city manager, prohibits retaliation, and requires prompt investigation and follow-up.

According to Adkins, on May 21, 2004, the plaintiff belligerently confronted Adkins during a department head meeting over matters apparently unrelated to sexual harassment. Pl.'s Ans. to Mot. Summ. J. Ex. 6, Scott Adkins Dep. at 42-43. Later that day, Adkins met with the plaintiff to discuss his performance. Atkins later wrote two appraisals of substandard work performance by the plaintiff, but did not mention the plaintiff's behavior at the meeting. The first appraisal notes that it memorialized a verbal correction of the plaintiff, and states in relevant part:

> On May 21, 2004 a discussion was held with the employee concerning work performance. Topics included lack of direct communication with City Manager for a period of over 3 1/2 weeks from April 23, 2004 until department head meeting this date (May 21, 2004). During this time period, only minimal conversation occurred, no verbal response to directives, only brief written notes were presented or messages provided by means of other employees. This concern was heightened during a period of severe weather and flood threats, whereby City Manager was unable to contact Mr. Schroeder on numerous occasions to receive Cass River water levels. City Manager received these levels from other City Employees (Dennis Schultz and Dennis Fent) and also through NOAA website. [sic] This action was a significant breach of job duties under the existing employee manual, and could have posed a threat to the Health, Welfare and Safety of City residents. This matter was verbally discussed at this verbal counseling meeting. Mr. Schroeder was also counseled concerning his timeliness in completing necessary tasks and reporting the progress to his immediate supervisor, the City Manager. Additional items discussed concerned follow-through on a directive given in February 2004 concerning creation of policies ad [sic] procedures for the Department of Public Services, as well as creation and implementation of training and safety programs within the department. A directive was given at this time to complete these items immediately, noting that there is an August 12, 2004 deadline placed by our insurance carrier. A request for a detailed vehicle maintenance report from Mr. Schroeder was also presented sat [sic] this time. An additional discussion was held concerning the treatment of front office staff,

-5-

specifically a complaint filed by one of the employees against Mr. Schroeder for violation of City sexual harassment and discrimination policy.

*Id.* Ex. 17, First Notice of Performance Counseling (May 21, 2004).

Adkins also notes in the first appraisal that he criticized the plaintiff for not adequately completing various tasks and repairs on time and for insubordinate behavior in voicing concerns about the operations of city administration and the size of a proposed pay raise. *Ibid.* The first appraisal states that there was prior discipline on November 23, 2004 during a discussion of performance at evaluation. The plaintiff questions the authenticity of the document alleging that "he was not employed with the Defendants on 11/23/2004" and contends that he never knew about some of the problems mentioned in the first performance appraisal. Pl.'s Ans. to Mot. Summ. J. at 6.

The second appraisal, which also is dated May 21, 2004, likewise indicates that it memorializes a conversation that Adkins had with the plaintiff, stating in relevant part:

> This is to document that Susan Kern, Deputy Clerk, has today made a formal harassment complaint against Mr. Ronald Schroeder. Ms. Kern states that the problem began several months ago when several off-colored and sexually explicit comments were made in the front office. The situation became acutely more uncomfortable On [sic] Friday May 7, 2004 when a discussion in the front office included more direct sexually harassing remarks. Ms. Kern stated that on May 7, 2004, Mr. Schroeder was present in the general office when a discussion concerning diets and weight loss was being held. During this discussion, Mr. Schroeder commented to Ms. Kern that "if she wanted to loose weight, she could loose at least 25 pounds by cutting off her fat, ugly head." This is not the first time that Mr. Schroeder has made negative comments to Ms. Kern in March; a similar comment was made concerning her new hairstyle. At this time, Mr. Schroeder was verbally counseled and advised that these type of comments were unacceptable and violated the City policy on harassment and discrimination. This previous comment was not of a sexual nature. Immediately following this recent comment (5-7-04), Mr. Schroeder was aware that Ms. Kern was emotionally upset, at which time, he stated to her "Maybe that wasn't the right thing to say, come over here Sue and hold your firm breasts against me." This statement was the clearly sexually suggestive statement that violates our Sexual Harassment Policy.

Pl.'s Ans. to Mot. Summ. J. Ex. 18.

The plaintiff insists that he did not receive copies of these written statements until he saw his

personnel file after he was fired. Concerning the second appraisal, he testified that:

> Q. . . . This document references in the first sentence that "Sue Kern, deputy clerk,
> has today made a formal harassment complaint against Mr. Ron Schroeder." Do you
> recall that Mr. Adkins discussed with you a complaint that Sue Kern had made
> regarding an incident which she alleges occurred on May 7th of 2004?
> A. No.
> Q. You're saying Mr. Adkins didn't raise that issue with you at all?
> A. No.

Pl.'s Ans. to Mot. Summ. J. Ex. 19, Pl.'s Dep. at 49. Also, he claims that he never received a copy

of the sexual harassment complaint lodged against him.

Adkins documented further deficiencies of the plaintiff on June 21, 2004. The City Manager

wrote a memorandum stating that he requested the plaintiff to have the trees along a trail trimmed

for a Mayor Exchange Day, the plaintiff reported the task complete, but the trees were not trimmed.

*Id.* Ex. 21, Memorandum Adkins to Schroeder Employee File (Jun. 21, 2004). The plaintiff states

that he was never provided a copy of this memorandum.

On July 14, 2004 at approximately 3:00 p.m., the plaintiff had an argument with Kern. At

Adkins' request, the plaintiff submitted a memorandum to Adkins dated July 14, 2004 defending

himself and complaining of harassment against Cooper by Kern. The memorandum describes the

events that took place on July 14, 2004 and some of the plaintiff's allegations against Kern:

> The following is my version of an incident that occurred at City Hall on
> Wednesday July 14, 2004 at approximately 3 p.m. Witnessed by Merri Lemcke, Don
> Stilson, Chris, and Chief Manier.
>
> I was receiving the new DPW pager from Merri Lemcke. As I was leaving
> the office, Don asked the group if they wanted anything from the store. He
> mentioned doughnuts from across the street. I commented, "Maybe you shouldn't

-7-

get Sue doughnuts, as it appears she's gained a little weight." This was an offhanded joke. Two months prior, Merri Lemcke had offered me a doughnut, and Sue had commented, "Shouldn't you be watching your weight?"

I went into Dana's office with Chief Manier to ask her to activate the pager. Sue came storming in, waving a piece of paper in my face screaming "Sexual Harassment." My comment was not only not malicious, it was by no means sexual in nature in any way. Not only was I insulted, I was angered by her assault.

I have been in the office when Sue has made numerous sexually explicit comments concerning Mark Cooper. One day as he was bending over digging up a wire to be repaired in front of City Hall, she made several sexually inappropriate comments. I witnessed other occasions where his name was brought up and she made sexual comments that made me uncomfortable. She once said "I love my husband, but if I got the chance I'd do him." These were witnessed by Merri Lemcke and Tina Bacon. She even has a file in her desk drawer filled with pictures of Mark. She has sworn Merri to remove them if anything ever happened to her, so her husband won't find them. I am offended that a woman who attends my church behaves like this in the office. I once told Mark of Sue's crush on him. She shrieked at me saying, "You've ruined it now!" I believe this is the cause of her animosity toward me.

Now she is leveling harassment charges against me. I am deeply offended at this allegation. The City has a sexual harassment policy in place. Under no circumstances does my offhanded joke fall under these guidelines. However, her inappropriate obsession and comments toward Mark Cooper do fall under these guidelines. Guidelines initiated after sexual harassment allegations were brought up by none other than Sue Kern at an earlier date. I feel Sue has deep emotional issues and by bringing them into the workplace, she undermines the stability of the whole organization.

As she has she has challenged my integrity and honor, know that I will defend myself to the best of my ability.

Defs.' Mot. Summ. J. Ex. C, Pl.'s First Memo. to Adkins (July 14, 2004). The plaintiff filed a letter supplementing the first, which described "rude and obnoxious" behavior by Sue Kern but no actions related to Cooper or sexual harassment. *Id.* Ex. D, Pl.'s Second Memo. to Adkins (July 14, 2004). Adkins also had other employees who witnessed the events on July 14, 2004 write statements, which do not conflict with the plaintiff's description of the events that day. Pl.'s Ans. to Mot. Summ. J.

-8-

Ex. 25. The plaintiff's statements are dated July 14, 2004, but there is some dispute over when

Adkins received them. The plaintiff contends the statements were delivered on July 14, 2004 before

the close of business, which Adkins disputes in his testimony, representing that the statements were

delivered on July 15, 2004 around 9:00 a.m. However, Adkins testified that he heard a verbal

complaint from the plaintiff concerning the subject matter of the statements on July 14, 2004. In

addition, Adkins said later that the plaintiff's written statements were received on July 14, 2004. *Id.*

Ex. 26, Kern Performance Statement at 1; Ex. 27, Christina Bacon Dep. at 11-12.

Adkins fired the plaintiff on the next day, July 15, 2004, by presenting him with a letter that

stated the following reasons for termination:

- Poor Work Performance
- Insubordination (failure to follow instructions)
- Violation of the policy on non-discrimination or sexual-harassment
- Falsification of personnel or other records
- Threatening, intimidating, coercing or interfering with employees or members of the public
- Violation of safety policies or engaging in any action which threatens the safe or efficient operation of the City
- Personal conduct which is obnoxious or abusive of other employees including gossip, rumors, and statements of a defamatory nature.

*Id.* Ex. 28, Termination Letter. Before completing the final draft of the letter, Adkins sought the

advice of the attorney for the City of Vassar, Ellen Crane. Adkins testified that he determined that

the plaintiff's accusations against Kern were meritless. Adkins testified:

> Q. Did you determine that Ms. Kern had violated any policies?
> A. I presented Ms. Kern with a copy of the city's sexual harassment handbook, and according to the accusations made from Mr. Schroeder at that time there may have been a violation. In speaking with Mrs. Kern we did find out that the comments were not directed toward Mr. Schroeder, but nonetheless she was still counseled on the city's policies and procedures.
> Q. Was there any truth to Mr. Schroeder's accusations against Ms. Kern? Was it verified?
> A. No, there was no verification.

Q. So why did you counsel her if there was no verification?

A. I had assumed that what Mr. Schroeder had said may have been truthful and wanted to certainly have conversation as soon as possible after the event. Things are fresher in someone's mind when you talk about it right away. And in having the letter from Mr. Schroeder he outlined certain items, and in speaking with Ms. Kern we went over the policy and procedure and advised her not to undertake any type of those activities. And she indicated that she had not, and we had no verification that she had violated it. But nonetheless she was still counseled.

*Id.* Ex. 6, Adkins Dep. at 22. All of the defendant city's employees went through sensitivity training concerning harassment on July 23, 2004.

On August 4, 2004, the plaintiff filed a complaint against the city and Scott Adkins alleging that the defendants retaliated against him for complaining about sexual harassment. The complaint contains four counts: (1) a violation of the Michigan Whistleblowers Protection Act, Mich. Comp. Laws § 15.362, (2) a violation of 42 U.S.C. § 1983 based on the plaintiff's exercise of free speech, (3) a violation of 42 U.S.C. § 1983 against Adkins based on the plaintiff's exercise of free speech, (4) a violation of the Michigan Civil Rights Act, Mich. Comp. Laws § 37.2701. After the completion of discovery, the defendants filed the present motion for summary judgment, to which the plaintiff responded.

II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

-10-

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C.*

-11-

*Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A.

The plaintiff's claims that the defendants violated his First Amendment rights are brought pursuant to 42 U.S.C. § 1983, under which the plaintiff must prove (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003). Since the plaintiff was a municipal employee, there is no dispute over the second component. The defendants argue, however, that the plaintiff has not proved a constitutional deprivation.

The Sixth Circuit has provided differing iterations of the elements of a First Amendment claim under section 1983. *Compare Farhat*, 370 F.3d at 588 (requiring proof of constitutionally protected activity, adverse action, and causation) *with Rodgers*, 344 F.3d at 596 (requiring proof that

-12-

speech addressed a matter of public concern, balancing the public employee's interest in speech against the government employer's interest in promoting efficiency, and a showing that speech motivated some adverse action against the public employee). These formulations are not necessarily inconsistent but rather organize the components of a First Amendment claim differently. The Court finds the formulation stated in *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), to be useful:

> A public employee who would succeed on a claim of retaliation in violation of the First Amendment must demonstrate (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted); *see also Mt. Healthy*, 429 U.S. at 287.

*Ibid.*

The first element, whether the plaintiff's speech was a constitutionally protected activity, is divided into the two sub-elements referenced in *Rodgers*. The first sub-element of the test – "whether the relevant speech addressed a matter of public concern," *Rodgers*, 344 F.3d at 596 – seeks to draw a line between issues "relating to any matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 146 (1983), and those that largely reflect the "quintessential employee beef" about incompetent or insensitive management. *Jackson v. Leighton*, 168 F.3d 903, 911 (6th Cir. 1999). The second sub-element invokes the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), calling upon the court to determine whether the employee's interest in speaking as he did outweighed the defendants' interests in keeping him

-13-

silent. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Connick*, 461 U.S. at 147-50). The factors to be considered in weighing the parties' respective interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

The defendants contend that the plaintiff has failed to bring forth evidence on the first main element – that his speech was constitutionally protected, and the third element – that the adverse employment action was motivated at least in part by protected speech.

1.

Whether Schroeder's speech was constitutionally protected requires an analysis of the two sub-elements noted above.

a.

The defendants contend that the plaintiff's speech is not protected under the First Amendment because it does not broach an issue of public concern. They argue that the focus of the speech was an ongoing work dispute between the plaintiff and Sue Kern. The defendants view the plaintiff's speech as offered as a defense to Kern's harassment complaint. Such speech for personal interest purposes, they say, falls outside the scope of protection, *see Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001), and mention of the violation of the City's sexual harassment policy was merely an incidental or fleeting reference to an arguably public matter, which is insufficient to make the subject matter an issue of public concern. *See Farhat*, 370 F.3d at 593.

-14-

"Matters of public concern include speech that 'relat[es] to any matter of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 146). Such speech calls attention to the functioning of government, misconduct of public employees or officials, or breaches of public trust. *See Connick*, 461 U.S. at 148; *Rodgers*, 344 F.3d at 596 *Brandenburg*, 253 F.3d at 898. This Court has held that "[s]exual harassment itself is inherently a matter of public concern." *Ebelt v. County of Ogemaw*, 231 F. Supp. 2d 563, 572 (E.D. Mich. 2002) (*citing Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001). However, mere mention of a public issue alone is not determinative of whether the speech is protected. When distinguishing public complaints about official misconduct from the "quintessential employee beef," the court must examine the context in which it was made. The court of appeals summarized the task in *Farhat*: "our circuit has distilled the 'public concern' test by stating that the court must determine: the 'focus' of the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker.'" *Farhat*, 370 F.3d at 592 (citations omitted).

The defendants argue that the main thrust of Schroeder's written statement to Adkins was a defense of his conduct alleged to violate the city's sexual harassment policy. The defendants point out that Schroeder never made a written complaint about Kern or the other women at city hall until Kern filed her complaint against him. The purpose of the statement, the defendants insist, was not to bring public misconduct to official attention but to address a private personnel matter.

These arguments are substantial, and the Court finds this to be a close question. There can be little doubt that Schroeder's motive in making the statement was to defend himself against harassment charges by an employee whom he believed also was guilty of violating the city's policy.

-15-

However, a private motive will not disqualify speech concerning a public issue from First Amendment protection. As the court of appeals has noted, "even if a public employee were acting out of a private motive with no intent to air her speech publicly . . . so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern." *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1052 (6th Cir 2002). Conduct that violated city policy that could lead to the harassment of a public contractor is a matter of public concern. And although much of Schroeder's statement related to private personnel matters, in "mixed speech" cases "the employee's entire speech does not have to focus on matters of public concern." *Rodgers*, 344 F.3d at 597.

The plaintiff's statement includes the following language: "I have been in the office when Sue has made numerous sexually explicit comments concerning Mark Cooper. . . . I am offended that a woman who attends my church behaves like this in the office. . . . The City has a sexual harassment policy in place. . . . [H]er inappropriate obsession and comments toward Mark Cooper do fall under these guidelines. Guidelines initiated after sexual harassment allegations were brought up by none other than Sue Kern at an earlier date. I feel Sue has deep emotional issues and by bringing them into the workplace, she undermines the stability of the whole organization." Defs.' Mot. Summ. J. Ex. C, Pl.'s First Memo. to Adkins (July 14, 2004). Although made in the context of a personnel dispute, these statements do touch upon a matter of public concern in a way that tips the balance in favor of the plaintiff on this issue and precludes summary judgment.

-16-

b.

When balancing the public employer's interests in efficient operations against the employee's speech interests as required by *Pickering*, the court considers whether "an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994). The balancing test focuses "on the disruption resulting from the speech itself, not other events." *Ibid.*

This Court has stated that "a valid complaint of sexual harassment will outweigh almost any governmental interest, legitimate though it may be otherwise." *Ebelt*, 231 F. Supp. 2d at 572 (*citing Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001)). There is no evidence that the plaintiff's memorandum containing allegations of sexual harassment by Kern disrupted the city's operation. Rather, the evidence shows that the plaintiff gave the memorandum to Adkins without incident after the argument with Kern, and that Adkins requested the statement. Adkins' testimony supports a conclusion only that the impact of the argument between the plaintiff and Kern disrupted the work place:

Q. Did Ron's July 14th, 2004 letter to you where he talks about what Kern did in terms of the sexually explicit comments, did that interfere or did that cause the operation of the city to cease?

A. It did interfere with the operation of the city, yes.

Q. How did it interfere with the operation of the city?

A. It created quite a bit of chaos in the front office. Obviously the office staff was upset. I know that Mr. Schroeder was probably upset or at least bothered by the situation, so I'm sure that it had to have some effect on his daily operations.

And there were certainly a lot of questions between the city hall and the department of public services on what had happened. You know, people were privy to maybe

-17-

bits and pieces of a story, and any time that you've got one employee pitted against
the next, or a presumption of that, there's a bit of tension.

Pl.'s Response Ex. 6, Scott Adkins Dep. at 93-94. The dispute between the employees may have
disrupted operations, but there is no evidence that the harassment complaint disrupted city
operations. The complaint did not interfere with the plaintiff's duties, it supported the goal of the
employer in maintaining a workplace that did not tolerate discrimination, it was made at the request
of Adkins, and arguably the complaint was required under the city's own sexual harassment policy.
Such speech must be allowed if the employer desires to maintain a workplace free of sexual
harassment.

2.

In determining whether there is sufficient evidence to warrant a trial on the causation
element, "th[e] analysis focuses on whether the adverse employment action was motivated in
substantial part by the plaintiff's constitutionally protected activity." *Sowards v. Loudon County*, 203
F.3d 426, 431 (6th Cir. 2000). The defendants point to the several grounds recited in the termination
letter to support the argument that the plaintiff's speech was not a motive for his firing. They
contend, correctly, that these reasons are supported by evidence in the record, and note that the
plaintiff was counseled for a violation of the sexual harassment policy for his statement to Sue Kern
on May 7, 2004. The counseling included a warning that another violation could result in further
action up to and including dismissal.

However, the plaintiff has identified evidence in the record from which a jury could infer that
the plaintiff's protected speech was part of the reason for his termination. For instance, the disputed
evidence, which must be viewed in the light most favorable to the plaintiff, suggests that the city did

-18-

not follow its progressive discipline policy on sexual harassment since the plaintiff claims that he was never warned of prior complaints before an incident was used as a ground to terminate him. There is evidence that the City gave short shrift to the plaintiff's sexual harassment allegations by not fully investigating them, in violation of the sexual harassment policy. Pl.'s Ans. to Mot. for Summ. J. Ex. 6, Adkins Dep. at 22. Finally, the temporal proximity between the complaint and the termination can demonstrate discriminatory animus. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004).

The defendants certainly have brought forth evidence that they would have taken the same action regardless of the plaintiff's speech. However, "this . . . burden 'involves a determination of fact' and ordinarily is 'reserved for a jury or the court in its fact-finding role.'" *Rodgers*, 344 F.3d at 603 (quoting *Perry v. McGinnis*, 209 F.3d 597, 604 n.4 (6th Cir. 2000)).

3.

The City of Vassar argues that it cannot be held vicariously liable for a constitutional violation under section 1983. *See Monell v. Department of Social Services*, 436 U.S. 658, 691, 694 (1978). However, in *Monell*, the Supreme Court also held that municipal liability will be found when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers." *Id.* at 698. Moreover, in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Court held that a municipality can be held liable under section 1983 for a decision by the city's policymakers when the official is the one who has the "final authority to establish municipal policy with respect to the action ordered." *Id.* at 479-81 (plurality opinion). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who

-19-

have final policymaking authority." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir. 1993).

In this case, city manager Adkins is Vassar's policymaker with respect to hiring and termination employment policies of the City. This authority is not made explicit by the City's Charter, but the defendants do not contest that the Charter authorizes the city manager to make personnel decisions. Adkins testified:

> Q. It's a weak mayor system?
> A. Yes, it is a weak mayor system.
> Q. So with respect to hiring and firings within the city, you are the final policy maker on that issue, correct?
> A. That's correct. With the exception of the city manager position, which of course is subject to the city council.

*See* Pl.'s Ans. to Mot. for Summ. J. Ex. 6, Scott Adkins Dep. at 10. Although the Charter does not vest total employment authority in the City Manager, it does state that the functions of the City Manager shall be:

> (a) To appoint the Treasurer, Assessor, Health Officer, Chief of Police, Fire Chief, and such other administrative officers as shall require appointment under the ordinances or resolutions of the Council, and subject to the approval of the council, the Clerk and City Attorney. . . .

Pl.'s Ans. to Mot. for Summ. J. Ex. 7, City Charter § 3.9. Other subsections of 3.9 make the manager responsible for efficient administration of the city government. The Charter also provides:

> Other Administrative Offices: . . . The Council may, by resolution upon the recommendation of the City Manager, create such additional administrative offices, or combine any administrative officers in any manner not inconsistent with state law, and prescribe the duties thereof as it may deem necessary for the proper operation of the city government. No creation of any administrative office, or combination there of one with another, shall abolish the office of City Manager nor diminish any of the duties or responsibilities of that office as set forth in this charter. The compensation of all such administrative officers shall be fixed by the City Manager in accordance with budge appropriations.

-20-

*Id.* § 3.10.

The evidence demonstrates that Adkins was invested with the final authority to establish a municipal policy within the meaning of *Pembaur*. His actions in this case are Vassar's actions. The Court believes that the record evidence precludes summary judgment against the City of Vassar on the plaintiff's section 1983 claims.

B.

Defendant Scott Adkins also argues that he is entitled to qualified immunity on the claim filed against him in his individual capacity. Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001): "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the officer's conduct violated a constitutional right,'" and then "the court must then decide 'whether the right was clearly established.'" *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting

-21-

*Saucier*, 533 U.S. at 201-02). The Sixth Circuit has expanded that inquiry into a three-step sequential analysis when the qualified immunity defense is raised in a summary judgment motion brought after discovery has been conducted, as here. "The first inquiry is whether the plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)); *Champion*, 380 F.3d at 901 (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)); *but see Dunigan v. Noble*, 390 F.3d 486, 491 n.6 (6th Cir. 2004) (applying the two prong test).

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004). Ordinarily, these questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

In this case, the right to be free from retaliation for speech protected by the First Amendment is clearly established. But the qualified immunity defense requires the Court to look beyond the right in the abstract. The Supreme Court has acknowledged that "[i]t is sometimes difficult for a [public official] to determine how the relevant legal doctrine . . . will apply to the factual situation the official] confronts." *Saucier*, 533 U.S. at 205. Qualified immunity protects municipal personnel who must operate along the "hazy borders" that divide acceptable from unreasonable conduct. *Id.* at 206.

-22-

In this case, the plaintiff's complaint about sexual harassment is intertwined among other statements offered in defense of his inappropriate conduct toward a coworker. The court of appeals has observed that "the most difficult cases to adjudicate are ' mixed speech' cases. i.e., those cases in which the speech for which the employee claims First Amendment protection arises in the context of an employment grievance or other personnel dispute." *Farhat*, 370 F.3d at 590. Likewise, this Court finds the question whether Schroeder's speech is protected to be a close one that falls within the "hazy borders" separating protected speech from internal employee disputes. The Court cannot say, therefore, that Schroeder's right to be free from adverse action for his complaint against Kern was clearly established in the context of this case.

Moreover, Adkins relied on the advice of counsel before tendering the termination letter to Schroeder. A defendant government official may be protected by qualified immunity, even if the constitutional right he violated was clearly established, under certain "extraordinary circumstance" exceptions, such as reliance on legal advice. *See V-1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1488 (10th Cir. 1990) (compiling cases); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (accounting for "exceptional circumstances" allowing qualified immunity defense where not otherwise entitled). The exception applies when the defendant demonstrates that the circumstances of the action taken in "reliance upon legal advice bars our imputation to [the defendant] of constructive knowledge concerning the laws allegedly violated by his conduct." *V-1 Oil Co.*, 902 F.2d at 1489 (citations and quotations omitted). The Court in *V-1 Oil Co.* set forth the following factors for courts to consider:

> Relevant factors include how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, *see Watertown Equip. Co. v. Norwest Bank Watertown*, 830 F.2d at 1496; *Ortega v. City of Kansas City, Kan.*, 659 F.Supp. at 1211, whether complete information had been provided to the advising attorney(s), *see Burk v. Unified School Dist. No. 329*, 646 F.Supp. at 1560-

-23-

61; *cf. Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1348-49 (7th Cir.1985) (separate opinion of Coffey, J.), the prominence and competence of the attorney(s), *see Alexander v. Alexander*, 573 F.Supp. at 375 & n. 4; *cf. Johnston v. Koppes*, 850 F.2d 594, 596 (9th Cir.1988), and how soon after the advice was received the disputed action was taken, *see Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir.1985); *Green v. Brantley*, 719 F.Supp. 1570, 1584 (N.D.Ga.1989).

*Ibid.* The evidence shows that the legal counsel unequivocally approved the termination, the information Adkins provided to the attorney included the draft letter, the attorney consulted was competent to serve as the city's counsel, and that the action took place immediately after receiving the advice.

The Court finds that Adkins is entitled to qualified immunity under the circumstances of this case.

## C.

The defendants' arguments that they are entitled to summary judgment on the plaintiff's related state law claims are not well developed and rely on the arguments concerning the federal claims. The outcome follows the decision on those claims, and the Court will deny the municipal defendant's motion and grant the individual defendant's motion. *See Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989).

## III.

The Court finds that although the question of whether the plaintiff's speech is protected under the First Amendment is a close one, the plaintiff has brought forth sufficient evidence to allow him to present his case against the City of Vassar to a jury on all counts. The individual defendant, Scott Adkins, is entitled to qualified immunity.

-24-

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 12] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the complaint is **DISMISSED** in its entirety against defendant Scott Adkins.

_____
DAVID M. LAWSON
United States District Judge

Dated: May 25, 2005

-25-